# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ANGELA ZAFFINO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 3:14-cv-1909 |
| ) | JUDGE CAMPBELL |
| METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE AND DAVIDSON ) | |
| COUNTY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Before the Court is the Motion for Summary Judgment (Doc. No. 57) filed by defendant the Metropolitan Government of Nashville and Davidson County ("Metro"). For the reasons set forth herein, the Court will grant the motion and dismiss this action.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff Angela Zaffino asserts that she is disabled and that Metro failed to make a reasonable accommodation for her disability, in violation of Section 102(b)(5)(A) of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(5)(A), as amended.

In November 2005, Zaffino suffered an ischemic stroke and was diagnosed with fibromuscular dysplasia. This disorder is incurable and places Zaffino at a high risk of suffering additional strokes. Complications associated with the disorder are preventable by managing Zaffino's blood pressure and limiting her exposure to undue stress and anxiety. Zaffino maintains that, as a result of this disorder, she is a disabled person.

From July 2006 through June 2013, Zaffino was employed as a guidance counselor at the

---

[1] The parties have failed to comply with the Local Rules of Court with regard to the Statement of Undisputed Facts and Response thereto.

DuPont Tyler Middle School ("DuPont Tyler") in Davidson County, Tennessee. Her disability did not prevent her from performing the essential functions of her job.

On June 14, 2013, Dr. Jesse Register, then Director of Schools for Metropolitan Nashville Public Schools ("MNPS"), operated by Metro, sent Zaffino a letter notifying her of his decision to transfer her from DuPont Tyler to Madison Middle School ("Madison") for the 2013–2014 school year. (Doc. No. 57-3.) The Employee Transfer Form documenting the transfer indicated that it would go into effect on July 25, 2013. (Doc. No. 67-4.)[2] Register did not know at the time he made the transfer decision that Zaffino was disabled.

Zaffino responded to the notice of transfer by sending a letter to MNPS dated Jun 24, 2013, giving notice of her disability and requesting accommodations under the ADA. (Doc. No. 57-4.) Specifically, Zaffino stated that she had suffered a serious stroke in 2005 that required her to be on medical leave for three months and that she had suffered complications related to her condition in 2011 that required hospitalization. She claimed that her disability did not impede her performance of her duties as school counselor, but she nonetheless required accommodations including:

> (1) that she be permitted to remain the school counselor at DuPont Tyler Middle School;
>
> (2) that she be permitted flexible scheduling in order to accommodate medical appointments;
>
> (3) that she be "allowed to work in a stress free environment to the best of the administrator's ability" (*id.*);
>
> (4) that she be permitted sick leave when suffering from serious migraines;
>
> (5) that she be permitted to "seek help from additional staff" when her stress level increased too much (*id.*);

---

[2] The Effective Date could be read as either July 15 or July 25. Construing this ambiguity in Plaintiff's favor, the Court presumes that it says July 25.

(6) that her work space temperature not exceed 72 degrees;

(7) that she retain her current office at DuPont Tyler.

In support of her request not to be transferred away from DuPont Tyler, Zaffino noted that the school was only two miles from Summit Medical Center ("Summit"), where her doctors were located. She stated: "Being moved from DuPont Tyler will cause me much undue stress and could possibly trigger the serious health issues that could lead to another stroke." (*Id.*)

After MNPS received this letter, Harold Finch, Director of the MNPS Workplace Safety Office, engaged with Zaffino to determine whether her requested accommodations were "reasonable and doable." (Doc. No. 57-7, Finch Dep. 26:15–16.) Finch testified that he met with Zaffino and then communicated the information he received from her and her physicians to Metro Legal and the MNPS administrators involved in the situation. Based on the information he conveyed, MNPS reached a decision on Zaffino's request for accommodations. (*Id.* 41:13–24.) On July 15, 2013, Finch sent Zaffino a letter stating that essentially all of her requested accommodations would be met, except that MNPS could not guarantee a stress-free environment and would not accede to her request that she not be transferred. As part of the rationale for denying that particular accommodation, Finch noted that Madison was approximately the same distance from Summit as Zaffino's primary residence. (Doc. No. 57-9.)

Zaffino did not report to Madison as directed on July 25, 2013 and instead was placed on administrative leave while she appealed the decision. At some point thereafter, MNPS offered Zaffino the alternative of being transferred to Dodson Elementary School ("Dodson") instead of Madison. (Doc. No. 57-2, Register Decl. ¶ 12.) Zaffino declined that offer (Pl.'s Dep. 150:20–22), and MNPS stood by the decision to transfer Zaffino to Madison. This lawsuit followed.

At issue here is whether MNPS violated the ADA by denying Zaffino the

3

accommodation she sought—that she be permitted to remain at DuPont Tyler—and whether Metro's proposed alternative—transfer to Dodson—was reasonable. In that regard, Zaffino testified repeatedly in her deposition that that the reason she sought the accommodation of remaining at DuPont Tyler was because of its proximity to Summit and her doctors. (*See, e.g.*, Doc. No. 67-1, Pl.'s Dep. 89:20–23 ("I asked them to remain [at DuPont Tyler] because it was closest to my doctor."); 91:16–18 ("I requested that I remain at DuPont Tyler due to my health issues, being in close proximity to my doctors and to the stroke center."); 111:19–113:15 (confirming that her concern about proximity to Summit was Zaffino's main reason for requesting to stay at DuPont Tyler, and that the other reasons concerned her relationships with students, families, and staff at DuPont Tyler); 139:2–19 ("[p]roximity of DuPont Tyler to Summit Hospital" was her primary concern for not wanting to transfer to Madison, but the difference in commute time was also a factor); 213:16–17 ("The main reason [I wanted to remain at DuPont Tyler] was to remain close to my doctors and Summit, yes.").)

When asked about how a job at Madison would have differed from her job at DuPont Tyler, Zaffino indicated her understanding that Madison was under state control and that the student population had higher poverty levels and more disciplinary problems. (Pl.'s Dep. 81:2–13.) However, Zaffino never testified that the reason she opposed transfer was because the fact of transfer, in and of itself, would cause more stress or an exacerbation of her symptoms. Instead, as indicated above, her opposition to being transferred arose from her fear of being transferred to a school that was further away from Summit, which she believed might result in a delay in treatment if she were to suffer a stroke while at work

She acknowledged in her deposition that Metro had offered her a transfer to Dodson instead of Madison. She testified that she would have considered accepting this alternative as an

4

accommodation because "it was in close proximity to [her] doctors and Summit." (Pl.'s Dep. 150:18–19.) She refused the job, however, "[b]ecause it was not guaranteed that [she] would remain at that school" for more than one school year. (Pl.'s Dep. 151:1–2.) When asked if there was ever a guarantee that she would remain in a particular school, Zaffino responded, "I have no idea." (Pl.'s Dep. 151:10–12.) Metro has submitted Dr. Jesse Register's sworn statement that "[n]o teacher is guaranteed placement at a particular school for more than one year." (Doc. No. 57-2, Register Decl. ¶ 13.) Zaffino has not offered any evidence to refute that statement.

Zaffino's doctors appeared concerned about the transfer because of the undue stress the mere thought of transfer appeared to be causing their patient, stress that—again—was apparently related to Zaffino's fear of being too far away from Summit. Zaffino's neurologist, Dr. Noel Lim, submitted several letters on Zaffino's behalf. In the first, dated June 18, 2013, Dr. Lim stated that he had been treating Zaffino for stroke, carotid stenosis, and migraines since 2005 and that, "[d]ue to her serious medical condition," it would be in her best interests "to be allowed to stay at Dupont Tyler Middle School where she will be within a 2 mile radius of Summit Medical Center, which is a certified stroke center." (Doc. No. 63, at 103.) Dr. Lim submitted additional letters dated July 15, 2013 (Doc. No. 63, at 108), August 1, 2013 (Doc. No. 62, at 244), and October 29, 2013 (Doc. No. 62, at 245). In the more detailed letter dated July 15, 2013, he noted that it would be important, if Zaffino suffered another stroke, that she be transported to a hospital designated as a certified stroke center, specifically Summit. He stated:

> The reason for this request [that she not be transferred from DuPont Tyler] is due to the increased stress of her job, which puts her at an increased risk of suffering another stroke. Transferring Ms. Zaffino to another school, places her at an increased risk for raising her stress level due to the change of environment along with a longer commute time; thus putting her at increased risk of hypertension and possible stroke. Ms. Zaffino does not suffer the same amount of stress from her home environment as she does from her job. Therefore, as her medical provider, I do not require her to live within a 2 mile radius of a stroke center. I do,

5

> however, recommend that she live within a reasonable distance. Again, I recommend that she remain at Dupont Tyler Middle, which is within 2 miles of Summit Medical Center, which is a certified stroke center.

(*Id.*) He repeated this recommendation in subsequent letters while also emphasizing that Zaffino had recently experienced more "labile and erratic" blood pressures as a result of the stress and anxiety caused by the proposed transfer. (Doc. No. 62, at 244.) He noted: "This is not a trivial matter as this continues to place her at an increased risk for another stroke. She has been my patient since the initial stroke and she has been stable for the last few years until this issue came up." (*Id.*) He repeated his "strong" recommendation against reassignment "as this has already caused her enough anxiety which in turn is setting her up for a possibly disabling if not fatal stroke." (*Id.*; *see also* Doc. No. 62, at 245.) There is no evidence in the record, however, that Dr. Lim was ever asked if it would be appropriate for Zaffino to transfer to Dodson.

Zaffino's family physician, Dr. Michael Mertens, also submitted letters to Finch on Zaffino's behalf, one dated July 22, 2013 and another dated October 28, 2013. Both letters note that Zaffino's stress level and blood pressure had been elevated in connection with the possible transfer, and both recommend that Zaffino remain at DuPont Tyler on the basis that it is within two miles of Summit and Mertens' and Lim's medical practices. (Doc. No. 63, at 111, 112.)

Dr. Martin Wagner, the neurologist engaged by MNPS to provide an independent medical opinion, initially submitted a letter to Harold Finch supporting Zaffino's request to remain at DuPont Tyler:

> Ms. Zaffino has been employed as a middle school guidance counselor at Dupont Tyler Middle School for the past eight years. Her job performance has been exceptional, as is apparent from a school services personnel observation form completed by the then school principal, Ms. Martin, on 12/17/2012.
>
> I have had the opportunity to review letters by Dr. Noel Lim, her neurologist, prepared on 06/18/2013 and 07/15/2013, as well as a report by her cardiologist, Dr. Thomas Williams, prepared on 05/02/2012. I also reviewed a letter prepared

6

> by Tiffany Taylor with the title Six Compliance Program dated 08/29/2013 and a letter by Kentucky school superintendent, Rick Walker, prepared on 09/17/2013. I also reviewed [a] letter prepared by Angela Zaffino, dated 06/24/2013, listing 7 accommodations requested. I do recommend that she remain as a professional school counselor at Dupont Tyler Middle School, where she functions exceptionally well and where the school is within 2 miles of Summit Medical Center, which is one of [the] few certified stroke centers in Tennessee. Should she experience stroke-like symptoms at school, she could be rapidly transported to Summit Hospital Emergency Department . . . .

(Doc. No. 57-10, Sept. 29, 2013 Letter, at 2–3.)

Finch avers in a declaration that, in evaluating Zaffino's request, he looked at a variety of schools and their proximity to hospitals that were certified as stroke centers. He found that DuPont Tyler was 1.8 miles from Summit, while Dodson was only 1.3 miles from Summit. Although Madison was 10.6 miles from Summit, it was only 3.5 miles from Skyline Medical Center which, as of June 2013, was certified as a comprehensive stroke center. (Doc. No. 57-8, Finch Decl. ¶¶ 8–11.) Having made these determinations, he requested additional information from Dr. Wagner.

Dr. Wagner was not asked about and did not offer any opinion about a possible transfer to Dodson, but, in response to questions from Finch, he sent a second letter noting that Skyline Medical Center was a certified stroke center on par with Summit, that the difference in distance between DuPont Tyler and Summit (2 miles) as opposed to that between Madison and Skyline (3.5 miles) "did not constitute a significant difference in the event of a medical emergency" and that if Zaffino suffered a medical emergency at either school, "she would be at a stroke certified medical center very quickly." (Doc. No. 57-10, at 3, Oct 1, 2013 Letter from Wagner to Finch.) On this basis Dr. Wagner concluded that Madison was as reasonable a workplace for Zaffino as DuPont Tyler "in terms of proximity to a certified stroke center." (*Id.*) On January 6, 2014, Dr. Wagner submitted a letter to David Hines, Employee Benefits Director for MNPS, again

7

confirming that

> there is no medical reason, including, but not limited to, the stress of changing jobs, commute time, or any specific work conditions at either Dupont Tyler Middle School or Madison Middle School, that would prevent Ms. Zaffino from performing her professional duties as a school counselor at Madison Middle School.

(Doc. No. 57-10, at 4.) Given that Dr. Wagner did not oppose transfer to Madison due to its proximity to Skyline Medical Center, it seems clear that he would not have opposed a transfer to Dodson either.

On October 3, 2013, Metro sent Zaffino a formal letter denying her request for accommodation in the form of being permitted to remain at DuPont Tyler. Zaffino was directed to report to work at Madison Middle School on October 7, 2013. She declined to do so on the basis of her health.

Zaffino filed this lawsuit in September 2014, asserting a claim based on Metro's failure to accommodate, in violation of the ADA. Metro filed its Motion for Summary Judgment on August 15, 2016. The motion has now been fully briefed and is ripe for review.

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). A fact is material if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

8

The moving party must provide evidence to the Court that demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 250. The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp.*, 477 U.S. at 324.

In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Van Gorder v. Grand Trunk W.R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson*, 477 U.S. at 249. The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to defeat summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. *Id.* at 251.

## III. ANALYSIS AND DISCUSSION

Title I of the ADA imposes upon employers a duty to make reasonable accommodations for "the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so "would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015). In order to establish a *prima facie* case of failure to accommodate, a plaintiff must show that: "(1) she is disabled within the meaning of the Act; (2) she is

9

otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 680 (6th Cir. 2014). "The employee also bears the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011). Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to demonstrate that the requested accommodation would impose an undue hardship. *Id.*

In its motion, Metro argues, first, that it had no obligation to accommodate Zaffino's disability, where Zaffino herself admits that the disability did not affect her ability to perform the essential functions of her job. Second, Metro argues that Zaffino was not "otherwise qualified" for the position, because she rejected Metro's proposed reasonable accommodation, thus removing her from the protection of the statute. Finally, Metro argues that the requested accommodation was not reasonable as a matter of law, because it pertained only to barriers outside the workplace, which are not the employer's responsibility. Zaffino opposes Metro's arguments and also argues that Metro did not engage in good faith in the interactive process, as required by law, which is a separate ADA violation.

The Court finds, as set forth below, that Zaffino was not "otherwise qualified" under the law because she rejected a proposed reasonable alternative accommodation. Finding that Metro is entitled to summary judgment on that basis, the Court does not reach Metro's other arguments. Zaffino's argument regarding Metro's good faith in engaging in the interactive process is also unavailing.

### A. Whether Plaintiff Is "Otherwise Qualified"

For purposes of its motion, Metro does not dispute that Zaffino is disabled as that term is defined by the ADA. Metro posits, however, that Zaffino cannot satisfy the second requirement of her *prima facie* case—that she was "otherwise qualified" for the position, with or without reasonable accommodation—because she turned down Metro's proposed alternative accommodation, that she be assigned to Dodson Elementary School instead of Madison Middle School. Metro argues that by refusing this accommodation, Zaffino removed herself from the protection of the ADA. In response, Zaffino argues only that, in light of the fact that Drs. Lim, Mertens, and Wagner all urged MNPS to permit Zaffino to remain at DuPont Tyler, there is a question of fact as to whether the proposed transfer to Dodson was a reasonable alternative accommodation.

The law is clear that an individual will no longer be considered a "qualified individual with a disability" if she rejects a reasonable accommodation. *See* 29 C.F.R. § 1630.9(d) (2011) ("An individual with a disability is not required to accept an accommodation . . . . However, if such individual rejects a reasonable accommodation . . . that is necessary to enable the individual to perform the essential functions of the position . . . , the individual will not be considered qualified."). In addition, "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–011 (6th Cir. 1996) (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69 (1986)). The reasonableness of an employer's offered alternative accommodation is generally a question of fact. *See, e.g.*, *Meachem v. Memphis Light, Gas & Water Div.*, 119 F. Supp. 3d 807, 818 (W.D. Tenn. 2015) ("[W]hether Defendant's offering was a reasonable accommodation is clearly within the purview of the jury.").

11

In this case, however, the facts are susceptible of only one interpretation. In Paragraph 12 of its Statement of Undisputed Facts ¶ 12, Metro avers: "Ms. Zaffino did not accept the position at Dodson Elementary." (Doc. No. 59.) Zaffino responded, without citing to the record, "**DISPUTED.** Ms. Zaffino could not do so based on the advice of her treating physicians as a result of her disabilities." (Doc. No. 68, at 5 ¶ 12.) That is, Zaffino does not dispute that she was offered transfer to Dodson but declined it, and she did not point to any part of the record that supports her assertion that her physicians recommended that she decline that offer.

The record establishes, to the contrary, that Zaffino did not decline the Dodson offer based on her physicians' recommendations. Instead, she testified in her deposition that she would have considered accepting the transfer to Dodson because "it was in close proximity to [her] doctors and Summit" (Pl.'s Dep. 150:18–19), but that she ultimately refused it "[b]ecause it was not guaranteed that [she] would remain at that school" for more than one school year. (Pl.'s Dep. 151:1–2.)

In her Response to the Motion for Summary Judgment, Zaffino has not reiterated this assertion or relied on it in support of her argument that the proposal was unreasonable. She also has not offered any evidence to refute Jesse Register's sworn statement that "[n]o teacher is guaranteed placement at a particular school for more than one year." (Doc. No. 57-2, Register Decl. ¶ 13.) Zaffino has offered no evidence that transfer to Dodson would have entailed lesser pay, more hours, or a more stressful job environment. Further, it is undisputed that Dodson was even closer to Summit and Zaffino's doctors' offices than DuPont Tyler. As indicated above, Zaffino testified repeatedly that her primary concern about being transferred to Madison was its distance from Summit, a concern that did not apply to Dodson.

More importantly, while Zaffino's physicians indeed recommended that Zaffino be

12

permitted to stay at DuPont Tyler, there is no indication that either Dr. Lim or Dr. Mertens advised Zaffino not to accept the proposed transfer to Dodson or that they were even aware that transfer to Dodson was a possible alternative. Further, the letters from both doctors as well as Dr. Lim's deposition testimony[3] make it clear that their recommendation that Zaffino not be transferred at all was based on their concern about her stress level and the resulting effects on her blood pressure caused by the mere thought of being transferred to a school that was significantly further away than DuPont Tyler from Summit and her doctors there. (*See, e.g.*, Doc. No. 61, Lim July 13, 2016 Dep. 28:19–22 ("[H]er fear was that if she had a stroke or had symptoms of a stroke, that she wouldn't be transported quickly enough to a primary stroke center."); *id.* at 29:18–21 ("All I know is that she felt if she was transferred, she was at risk for not being closer to the stroke center, from where I'm at.").) Thus, there is no suggestion in the record that they would have been opposed to her transferring to a school that was even closer to Summit than DuPont Tyler.

Likewise, Dr. Wagner was not asked to opine about a possible transfer to Dodson, but he did not have any concerns about Zaffino's being transferred to Madison once he was apprised of the fact that Madison was only three miles from Skyline Medical Center, a certified stroke center. (*See* Doc. No. 57-10, at 3 ("Skyline Medical Center is a little over three miles from Madison Middle School. Summit Medical Center is about two miles from Dupont Tyler Middle School. That one extra mile does not constitute a significant difference in the event of a medical emergency. If Mrs. Zaffino suffered a medical emergency at either of these schools, there would be other staff available who could summon ambulance, and she would be at a stroke certified medical center very quickly . . . ."); *see also* Doc. No. 57-10, at 4, Jan. 6, 2014 Letter from

---

[3] Dr. Mertens' deposition testimony is not in the record.

13

Wagner to MNPS Employee Benefits Director, stating: "[T]here is no medical reason, including, but not limited to, the stress of changing jobs, commute time, or any specific work conditions at either Dupont Tyler Middle School or Madison Middle School, that would prevent Ms. Zaffino from performing her professional duties as a school counselor at Madison Middle School.").)

In sum, the stated reason Ms. Zaffino and her physicians opposed the transfer to Madison was its distance from Summit, which caused her undue stress. None of her physicians recommended against transferring to Dodson, which did not pose the same obstacle, as it was closer to Summit than was DuPont Tyler. Ms. Zaffino has not shown that any transfer *per se* was unreasonable or dangerous for her health, and she does not argue that the job at Dodson was less desirable than the job at DuPont Tyler. Metro has established that the proposed alternative was reasonable, and Zaffino's unsupported reference to her doctors' recommendations does not give rise to a question of fact as to the reasonableness of the transfer to Dodson.

Because Zaffino refused MNPS's reasonable alternative accommodation—transfer to Dodson—Zaffino cannot establish that she was "otherwise qualified" for the job in question. Because Zaffino cannot establish all the elements of her *prima facie* case, Metro is entitled to summary judgment on her failure-to-accommodate claim under the ADA.

### B. The Interactive Process

The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). The purpose of that process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* The Sixth Circuit has explained that, "[e]ven though the interactive process is not described in the statute's text, the

14

interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007) (footnote and citations omitted). The Sixth Circuit recognizes that the ADA "mandates this process to ensure that employers do not disqualify applicants and employees based on stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job." *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (citation omitted). "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." *Id.* (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). Although the process is mandatory, "failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation." *Id.* at 1041.

In her Response to the Motion for Summary Judgment, Zaffino argues that there is "ample evidence" in the record that MNPS did not participate in the interactive process in good faith. (Doc. No. 67, at 43.) The evidence of lack of good faith to which she points is Finch's statement to her that she did not look like she had a disability and appeared to be healthy; that he refused to accept Dr. Wagner's recommendation that Zaffino not be transferred; and that Amy Downey, MNPS Executive Lead Principal, who also participated in discussions related to Zaffino's request to remain at DuPont Tyler, did not think of Zaffino as being ill or having a disability and was unaware of the Zaffino's physicians' recommendations against transfer to Madison. This evidence simply does not suggest that MNPS failed to engage in good faith in the interactive process. Whether Zaffino appeared disabled is not relevant to the inquiry, and an employer's refusal to provide a specific requested accommodation does not indicate that it failed

15

to engage in the interactive process, particularly when it offered a reasonable alternative. Moreover, while an employer is not required to propose a counter-accommodation in order to participate in the interactive process in good faith, doing so constitutes "additional evidence of good faith." *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010) (citations omitted). And, as set forth above, if the employer "takes that step and offers a reasonable counter accommodation, the employee cannot demand a different accommodation." *Id.* (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)).

In this case, the evidence overwhelmingly establishes that MNPS engaged in good faith in the interactive process. Harold Finch, on behalf of MNPS, met with Zaffino, agreed to most of her requested accommodations, reviewed documentation from her physicians, and obtained an opinion from an independent medical examiner. Because he understood her objection to Madison to be based on its distance from Summit, a certified stroke center, he conducted an independent inquiry into the distances of various schools from Summit and from Skyline Medical Center, also a certified stroke center. Based on this investigation and feedback from Dr. Wagner, he was authorized by Register to propose Dodson as a reasonable alternative to Zaffino's demand that she not be transferred to Madison due to its distance from Summit. *Cf. Jakubowski*, 627 F.3d at 203 ("An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff.").

There is no dispute that Metro participated in the interactive accommodation process in good faith. Metro is entitled to summary judgment on this claim as well.

16

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and dismiss this action in its entirety. An appropriate order is filed herewith.

```
                                        _____
                                        TODD CAMPBELL
                                        UNITED STATES DISTRICT JUDGE
```